UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

EMMA SANDERS,                              )
                                          )
          Plaintiff,                      )
                                          )
     v.                                   )          No.   4:11CV1735 RWS
                                          )                        (TIA)
MICHAEL J. ASTRUE,                        )
COMMISSIONER OF SOCIAL SECURITY,          )
                                          )
          Defendant.                      )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security Administration.  The

case was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. §

636(b).  The suit involves Applications for Supplemental Security income payments and Widow's

Insurance Benefits.  Claimant has filed a Brief in Support of her Complaint; the Commissioner has

filed a Brief in Support of his Answer.

**I.      Procedural History**

Claimant Emma Sanders filed Applications for Supplemental Security Income payments

pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq. (Tr. 202-04)[1] and

Widow's Insurance Benefits under Title II of the Act.  (Tr. 205-08).[2]  Claimant states that her

---

[1]"Tr." refers to the page of the administrative record filed by the Defendant with its Answer
(Docket No. 10/filed January 23, 2012).

[2]In order to be entitled to widow's insurance benefits, Claimant must be a widow of a fully-
insured individual, be at least 50 years old, but younger than 60 years old, and be disabled.  See
20 C.F.R. §404.335(c).  Therefore, even though she meets the other requirements, Claimant must
also be found to be disabled before she is entitled to widow's insurance benefits.

disability began on December 17, 1997, as a result of paranoid schizophrenia, depression, high blood pressure, suicidal, anxiety disorder, and recovering alcoholic. (Tr. 256). On initial consideration, the Social Security Administration denied Claimant's claims for benefits. (Tr. 68-70). Claimant requested a hearing before an Administrative Law Judge ("ALJ"). On August 18, 2009, a hearing was held before the ALJ who issued an unfavorable decision on October 21, 2009. (Tr. 48-65, 68-80). On November 12, 2009, Claimant filed a Request for Review of Hearing Decision, and the Appeals Council granted the request for review and remanded the case to the ALJ to address certain matters on August 11, 2010. (Tr. 82-85,144-47). In relevant part, the Appeals Council directed the ALJ to resolve the following:

> The hearing decision finds the claimant can return to her past relevant work as a food preparation employee (finding 7). However, the Administrative Law Judge did not make the required function-by-function comparison between the job demands of the claimant's past relevant work and the specific limitations in the residual functional capacity. Moreover, the record lacks sufficient evidence to support a finding on whether, given the established residual functional capacity, the job demands of work as a food preparation employee is possible.... The Appeals Council finds that further evaluation of the claimant's ability to perform her past relevant work is warranted.
>
> Obtain evidence from a vocational expert to allow comparison between the claimant's residual functional capacity and the mental and physical demands of the claimant's past relevant work.... If it is determined the claimant is unable to perform her past relevant work, the Administrative Law Judge will continue the mandated sequential evaluation process.
>
> If warranted by the expanded record, obtain evidence from a vocational expert to clarify the effect of the assessed limitations on claimant's occupational base (Social Security Ruling 85-15) and to determine whether the claimant has acquired any skills that are transferrable to other occupations under the guidelines in Social Security Ruling 82-41. The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy .... Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and

resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (SSR 00-4p).

(Tr. 82, 84).

On February 17, 2011, a subsequent hearing was held before an ALJ. (Tr. 28-47). Claimant testified and was represented by counsel. (Id.). Thereafter, on April 1, 2011, the ALJ issued a decision denying Claimant's claims for benefits. (Tr. 7-21). The Appeals Council on August 8, 2011 found no basis for changing the ALJ's decision and denied Claimant's request for review of the ALJ's decision. (Tr. 1-6). The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.    Evidence Before the ALJ

### A.  Hearing on February 17, 2011

#### 1.  Claimant's Testimony

At the hearing on February 17, 2011, Claimant testified in response to questions posed by the ALJ and counsel. (Tr. 28-47). At the time of the hearing, Claimant was sixty-two years of age. (Tr. 31). Claimant's date of birth is August 14, 1948. Claimant testified that she lives by herself, and she has lived at the same residence for two years. (Tr. 31). Claimant has three children ages 44, 45, and 46. (Tr. 32). Claimant completed the seventh grade. Claimant stands at five feet seven inches and weighs 175 pounds. (Tr. 32). Claimant does not have any insurance or Medicaid. (Tr. 33). Claimant testified that she had Medicaid, but she was cut off in October or November. (Tr. 33).

Claimant testified that she was released from prison on September 26, 2007, and she has not worked since being released. (Tr. 33). Claimant testified that she has not tried to get a job or

look for a job.  (Tr. 33).  Claimant is on parole, and she is not required to look for a job as a condition of her parole.  (Tr. 34).  Claimant completes her term of parole in one year.  Claimant's original offense was possession of a controlled substance.  Claimant testified since being released from prison she has not done any drugs or consumed alcohol.  (Tr. 34).  Claimant attends AA meetings twice a week.  (Tr. 35).

Dr. Krojanker, a psychiatrist at the Hopewell Clinic, treats Claimant for paranoid schizophrenia.  (Tr. 35).  Claimant testified that she was first diagnosed in 1977.  (Tr. 35). Claimant sees Dr. Krojanker every three to four months, and she sees a case manager.  (Tr. 36). Claimant testified that her medications have not changed in awhile.  (Tr.36).

As to her daily activities, Claimant testified that she watches television, cleans up, listens to music, and lies down.  (Tr. 36, 38).  Claimant never leaves the house unless she has a doctor's appointment.  (Tr. 36).  Sometimes it bothers Claimant to be around other people.  (Tr. 37). Claimant testified that she has problems standing or walking too long.  Claimant on occasion has anxiety attacks.  (Tr. 37).  Claimant sometimes has problems sleeping at night and sometimes takes nap during the day.  (Tr. 38).   Claimant testified that she used to play chess, dance, and sing, but she can no longer partake in those activities.  (Tr. 39).  Claimant sometimes has problems doing the chores around the house, because she cannot stand too long because of her back.  (Tr. 43).  Claimant testified that she has not discussed with a doctor her back problems. Claimant started experiencing problems standing on her feet in 2003 when she quit working.  (Tr. 43).  Claimant testified that she has crying spells once a week.  (Tr. 44).  Claimant experiences mood swings and has good and bad days.  (Tr. 44).  Claimant has problems concentrating.  (Tr. 46).

Claimant testified that she had been hospitalized after attempting suicide. (Tr. 39). Claimant has thoughts of suicide once a month. (Tr. 40). Claimant takes the bus to her doctor's appointments. (Tr. 39). Claimant has no problems taking public transportation. (Tr. 39). Claimant testified that she is paranoid of people. (Tr. 40). Claimant testified that she does not like being around people. (Tr. 41). Claimant feels her condition is becoming worse over time. (Tr. 41).

### 2. Forms Completed by Claimant

In the Function Report - Adult completed on December 31, 2007, Claimant reported attending meetings daily and going to her daughter's house. (Tr. 265-66).

In the case analysis dated February 15, 2008, Ms. Otterson noted that the "[e]vidence in file reveals that hypertension has been diagnosed, and is treated with medications.... There is no evidence of end organ damage due to hypertension." (Tr. 269).

### III. Medical Records

In the June 20, 1989 Residual Functional Capacity Assessment, Dr. Anver Tayob found Claimant to be unlimited in her ability to lift, stand, sit, walk, and push and/or pull. (Tr. 545). Dr. Tayob noted Claimant could occasionally stoop and could frequently climb, balance, kneel, crouch, and crawl. (Tr. 545).[3]

The medical records from the Department of Corrections show that on October 8, 2004, Alice Clay completed a mental health evaluation of Claimant. (Tr. 355). Claimant reported having a diagnosis of paranoid schizophrenia and admitted to polysubstance abuse. The examiner noted Claimant presented with a stable mood and appropriate affect, no significant impairment in

---

[3]The undersigned notes that Claimant's counsel mistakenly attributes the assessment date of June 20, 2009. (Tr. 546).

recent or remote history, and insight and judgment appeared to be fair. The examiner noted Claimant to be oriented in four spheres with no signs or symptoms of psychosis, depression or mania and no current symptoms of elevated mood or agitation. Although the examiner found the assessment to be no assessment, she referred Claimant to a psychiatrist. (Tr. 355).

During examination by a psychiatrist, Dr. Rajendra Gupta, Claimant reported hearing evil voices telling her to hurt others. (Tr. 356). Claimant's past psychiatric history included being admitted to Malcolm Bliss for follow-up treatment for drug addiction. Dr. Gupta observed Claimant to have appropriate mood and being able to express herself well, and she was not delusional or paranoid. Dr. Gupta noted Claimant to be vague and evasive about the voices she hears. Claimant reported starting to see things and hear voices when she started using drugs. (Tr. 356). Dr. Gupta's diagnosis included mood disorder with psychosis/crack and cocaine dependence, antisocial personality disorder, and legal/drug problems. (Tr. 357). Dr. Gupta assessed her GAF to be 45 and increased her Haldol, Cognetin, and Trazodone prescriptions and urged her to attend AA meetings for her drug addiction. (Tr. 357). In a follow-up visit on December 15, 2004, Claimant requested to change the dosage of her Haldol prescription. (Tr. 358). Claimant reported doing okay and going to school. In the assessment, Dr. Gupta noted Claimant to have a mood disorder with psychosis/polysubstance abuse and requested Claimant to return in two months. (Tr. 358).

On February 7, 2005, Claimant reported being unable to sleep because of her medications. (Tr. 358). Dr. Gupta adjusted Claimant's medications. (Tr. 360). On February 28, 2005, Claimant reported being like a zombie and requested reducing the dosage of her Haldol prescription to 2 mg. (Tr. 360-61). Claimant reported still hearing voices, but she could "manage

them with the Trazodone." (Tr. 361). The examiner observed Claimant to be calm, cooperative, talkative, maintain good eye contact, have organized thoughts, fair insight, poor judgment, and no psychosis at that time. Diagnosis was mood disorder, not otherwise specified, with psychotic features. The examiner encouraged Claimant to take her medications. (Tr. 361). In the March 29, 2005, treatment note, Dr. Daniel Meadows noted that Dr. Hucke discontinued her medication at her initiation, because she reported the medication made her feel depressed. (Tr. 363). Claimant reported refusing to take Haldol, because the medication made her irritable and depressed and probably would make her hallucinate. Claimant denied having any auditory psychosis in the last two months. Dr. Meadows observed Claimant to be oriented and her mood to be stable. Dr. Meadows noted her affect seems congruent with her mood and her insight and judgment to be mixed. (Tr. 363).

On May 16, 2005, Claimant reported "feeling fine, doing alright." (Tr. 366). Dr. Hucke assessed her GAF to be 50 and assessed Claimant with mood disorder/ethanol polysubstance abuse. (Tr. 367). In a follow-up visit on June 20, 2005, the examiner assessed Claimant's GAF to be 60. (Tr. 370). On July 20, 2005, Claimant reported hearing voices but not listening to them. (Tr. 371). Dr. Hucke continued Claimant's Trazodone prescription, and Claimant declined to take any antipsychotic medication. (Tr. 372). In the August 29, 2005 nurse encounter note, the nurse noted that Claimant's treatment plan was reviewed, and Claimant willing to work on maintaining mood stabilization. (Tr. 375). On September 15, 2005, Dr. Hucke assessed Claimant's GAF to be 50 and continued her Trazodone prescription. (Tr. 377). On November 23, 2005, Claimant reported she would eat everything she could to Dr. Hucke. (Tr. 383). Dr. Hucke assessed her GAF to be 45. (Tr. 384).

On January 25, 2006, Claimant reported that her estranged husband died recently. (Tr. 387). Dr. Hucke assessed her GAF to be 45 and continued her medication regimen. (Tr. 388). On March 29, 2006, Claimant reported being upset, because she must complete drug treatment in Vandalia. (Tr. 392). Dr. Hucke observed Claimant's mood to be appropriate and stable and her anxiety to be controlled and her insight/judgment to be poor. (Tr. 392). On May 31, 2006, Claimant expressed concern about being sent to Vandalia for long term treatment. (Tr. 396). Claimant reported being satisfied with current medications. (Tr. 396). Dr. Hucke continued her medication regimen. (Tr. 396). In follow-up treatment on July 26, 2006, Claimant reported being fine and "fearful of going to werdcc before she gets her ged." (Tr. 400). Dr. Hucke assessed her GAF to be 50 and continued her medication regimen. (Tr. 400). On August 29, 2006, Claimant acknowledged improvement with both dysphoria and auditory hallucinations and agreed her medication regimen to be appropriate and requested no changes. (Tr. 401). Claimant indicated that she processed through the loss of her husband well. Claimant noted that her auditory hallucinations have improved since her years of using drugs, and she has educated herself enough to "handle it." The examiner observed Claimant to be oriented, her mood to be appropriate and affect congruent with her mood. Claimant has mild auditory hallucinations, and she requested no changes in her medication regimen. Mood disorder, not otherwise specified with mild psychotic features is listed in the assessment. (Tr. 401).

On October 19, 2006, Claimant reported being anxious and nervous but denied having hallucinations or delusional thoughts. (Tr. 402). Dr. Agara Reddy found Claimant not to have any active psychotic symptoms at that time and assessed Claimant with mood disorder, not otherwise specified and ethanol dependence. As treatment, Dr. Reddy changed her medications.

(Tr. 402). On November 27, 2006, Claimant requested discontinuing her Haldol and decreasing her Trazodone dosage. (Tr. 403). Claimant denied feeling depressed, having hallucinations, or having any other problems. The examiner noted Claimant's mood to be stable with affect. On November 28, 2006, the doctor discontinued Haldol and decreased her Trazodone dosage. (Tr. 403).

In a follow-up visit on December 22, 2006, Claimant reported doing better and denied having a depressed mood. (Tr. 403). In an encounter appointment on March 2, 2007, Claimant reported her medications making her sleepy. (Tr. 404). The examiner observed Claimant to have a calm affect, mood, good eye contact, and thoughts to be clear and intact. Claimant denied being depressed. (Tr. 404).

On February 28, 2007, Claimant received treatment for her hypertension. (Tr. 449). Dr. Sripatt Kulkamthorn noted he considered discontinuing her medication and monitor her blood pressure in the clinic for one year. (Tr. 451).

In a doctor encounter appointment on March 19, 2007, Claimant reported doing okay and denied being depressed. (Tr. 404). On May 9, 2007, Claimant reported doing okay and may be going home in three months. (Tr. 405). On July 12, 2007, Claimant indicated that she is doing okay and denied being depressed. (Tr. 407). On August 16, 2007, the examiner noted Claimant to be oriented, her mood to be good, and insights/judgment to be good. (Tr. 408).

On September 27, 2007, during an initial diagnosis at New Beginnings, the examiner found Claimant to have moderate alcohol and cocaine dependence; major depressive disorder, recurrent, unspecified; and schizophrenia, paranoid type. (Tr. 410-15). The examiner assessed her GAF to be 58. (Tr. 416).

Between October 24 through October 26, 2007, Claimant received treatment at Grace Hill for swelling in her legs and was diagnosed with hypertension, GERD, and paranoid schizophrenia. (Tr. 475-81).

In the November 19, 2007 treatment note from Murphy O'Fallon Health Center, Dr. Phillip Asaro noted Claimant seeking Hepatitis A and B vaccines inasmuch as she hoped to work at a job involving health care and food preparation. (Tr. 505). Dr. Asaro noted Claimant's blood pressure to be okay. (Tr. 505).

In the December 5, 2007 progress note, Dr. Rolf Krojanker noted that Claimant reported having been treated by him for years, but Claimant had not seen him for three years. (Tr. 524). Claimant had been attending AA meetings. Dr. Krojanker diagnosed Claimant with schizophrenia, partial compliance, and psychosocial stressors marked to partial compliance. (Tr. 524).

In a follow-up visit on December 19, 2007, Dr. Asaro increased her Lipitor dosage. (Tr. 506).

On January 17, 2008, Dr. Inna Park evaluated Claimant's hypertension. (Tr. 482). Dr. Park noted Claimant was diagnosed with hypertension eight to nine years ago with high blood pressure and has been treated with medications. Claimant noted no organ damage. Claimant reported stopping smoking two years earlier. Claimant reported having last consumed alcohol in November, 2007 and last using marijuana in September, 2003. (Tr. 482). Dr. Park observed Claimant to be an obese female in no apparent distress with normal speech and affect. (Tr. 483). Examination showed no palpable tenderness of the cervical, thoracic, or lumbar spine. Dr. Parks observed Claimant able to get off the examination table without difficulty and to have a normal

gait and station. (Tr. 483). Dr. Parks noted in the clinical impression Claimant to have hypertension with no end organ damage. (Tr. 484).

On January 17, 2008 on referral by the Section of Disability Determinations, Dr. Mades completed a psychological evaluation. (Tr. 488). Claimant reported last working in September 2004 as a catering worker. Dr. Mades noted Claimant's chief complaints to be "[d]epression, high blood pressure, schizophrenia, suicidal, anxiety disorder, recovering alcoholic." (Tr. 488). Claimant complained of being incarcerated for three years and a history of back injury with difficulty standing. (Tr. 488). Claimant reported being hospitalized in the 1990s after a suicide attempt. (Tr. 489). Claimant has been treated at Hopewell for ten years. Claimant last consumed alcohol in September 2007 and prior to her incarceration, she would consume 64 ounces of beer each day. Dr. Mades opined that Claimant "appeared to be minimizing her substance abuse given her history of at least one blackout and rather coincidentally testing positive for cocaine while on probation; and she may not, therefore, be a fully reliable informant regarding substance abuse." (Tr. 489). Dr. Mades noted Claimant's attitude to be generally cooperative and pleasant. (Tr. 490). With respect to her ability to relate, Dr. Mades observed Claimant to be coherent, relevant, and logical. (Tr. 491). With respect to thought content, Dr. Mades opined that although Claimant reported auditory and visual hallucinations, her reporting seemed unreliable and equivocal. Examination showed Claimant's flow of thought to be logical, and no clear evidence of thought disturbance. (Tr. 491). Claimant reported living with a friend and taking care of the household chores such as cooking and cleaning. (Tr. 492). Claimant spends her time reading, listening to music, and watching television. Dr. Mades noted Claimant to be able to maintain adequate attention and concentration with appropriate persistence and pace during the

examination. Dr. Mades assessed Claimant's GAF to be 75. (Tr. 492). Dr. Mades noted no evidence of thought disturbance during the examination and found her claims of hearing and seeing things not to be credible. (Tr. 493).

In the Psychiatric Review Technique complete on February 15, 2008, Dr. Robert Cottone found Claimant's impairments of affective disorders and substance addiction disorders not to be severe. (Tr. 494). In support, Dr. Cottone cited the examination in August 2007 revealed Claimant to have good mental status without evidence of listed signs and symptoms, and her mood to be good and insight and judgment to be intact. (Tr. 497). Dr. Cottone found Claimant to have no restrictions of activities of daily living or difficulties in maintaining concentration, persistence, or pace and mild restrictions in difficulties in maintaining social functioning. (Tr. 502).

In a follow-up visit on February 20, 2008 at the Murphy O'Fallon Health Center, Dr. Asaro noted Claimant's blood pressure to be good, and Claimant did not have any complaints. (Tr. 507). On May 19, 2008, Dr. Asaro found Claimant's blood pressure to be borderline and increased her Lipitor dosage. (Tr. 512).

On May 22, 2008, Claimant requested a statement regarding her diagnosis. (Tr. 525). Claimant reported gaining fifty pounds, and Dr. Krojanker encouraged Claimant to exercise. (Tr. 525).

In a follow-up visit on July 7, 2008, Dr. Asaro noted Claimant's blood pressure to be good on her current medications and advised Claimant to lose weight. (Tr. 513). Claimant returned on August 25, 2008 and reported not having completed the fasting lab work as recommended by Dr. Asaro during her last visit. (Tr. 514). Dr. Asaro recommended having

fasting lab work done.  (Tr. 514).

On August 15, 2008, Claimant reported feeling good and walking a mile on the treadmill during treatment by Dr. Krojanker.  (Tr. 526).

On November 19, 2008, Claimant reported feeling better and walking on a treadmill.  (Tr. 518).  Claimant living with her daughter.  (Tr. 521).

In a follow-up visit on March 18, 2009, Claimant reported being stressed out, because her daughter is moving to Texas, and she is looking for an apartment.  (Tr. 521).  Claimant's weight had increased, and she reported exercising less.  (Tr. 521).  In the March 27, 2009 intake assessment, Marie Dixon, , MSW,CM at Hopewell Center, Inc. evaluated Claimant on a self referral.  (Tr. 528).  Claimant reported problems getting her medications, having symptoms of paranoia, impulsivity, anxiety, auditory hallucinations, being easily frustrated, and difficulty sleeping.  (Tr. 528).  Claimant "denied any problems that would hinder them from working or going to school."  (Tr. 529).  Claimant's recreational interests included watching television, spending time with the family, and eating out.  Claimant admitted to a history of substance abuse, cocaine being the drug of choice, starting in her late teens and ending two years earlier.  (Tr. 529).

On September 23, 2009, Dr. Phillip Asaro treated Claimant at Grace Hill Neighborhood Health Services.  (Tr. 533/699).  Claimant reported being out of her medications and needing treatment for hypertension, asthma, lipids, and obesity.  Claimant reported working on weight loss, and at the time of her visit, her weight was down, and she was not depressed.  (Tr. 533/699).  Dr. Asaro directed Claimant to resume her medications and prescribed Zyprexa, Haloperidol, Flovent, Hyoscyamine Sulfate, Trazodone, Hydrochlororthiazide, Norvasc, Proair, Lipitor, and Ranitidine.  (Tr. 535/700).

In a follow-up visit on January 27, 2010, Claimant reported no side effects from her medications, losing some weight, and occasionally hearing voices. (Tr. 539). Dr. Krojanker continued her medication regimen and scheduled another appointment in four months. (Tr. 539).

Dr. Krojanker completed a Mental Residual Functional Capacity Questionnaire on December 6, 2010 and opined his prognosis to be guarded and found Claimant to suffer from schizophrenia, chronic type. (Tr. 540). Dr. Krojanker checked boxes indicating Claimant to be seriously limited but not precluded in the mental abilities and aptitudes needed to perform unskilled work and particular types of jobs, but unable to meet the competitive standards of semiskilled and skilled work. (Tr. 541-42).

## IV. The ALJ's Decision

The ALJ found that Claimant was born on August 14, 1948, and she is the widow of the wage earner, who died fully insured on January 9, 2006, and she has not remarried since his death. Accordingly, the period during which Claimant must establish that she was under a disability extended through July 31, 2008. The ALJ found that Claimant has not engaged in substantial gainful activity since December 17, 1997, her alleged onset date of disability. The ALJ found that the medical evidence establishes that Claimant has obesity, hypertension, schizophrenia, and a history of substance abuse, but no impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ opined that Claimant's allegations of impairments producing symptoms and limitations of sufficient severity to prevent the performance of any sustained work activity to be not credible. (Tr.20). The ALJ found that Claimant has the residual functional capacity to perform the physical exertional and nonexertional requirements of work so long as the jobs do not require more than simple, routine,

repetitive, unskilled tasks. (Tr. 20-21). The ALJ found that Claimant does not have any credible, medically established physical or other mental or other nonexertional limitations. (Tr. 21). The ALJ determined that Claimant is capable of performing past relevant work as a food preparer for a catering service. The ALJ found that Claimant was not under a disability at any time from July 31, 2008 through the date of the decision. The ALJ further found that Claimant does not have a substance abuse disorder that is uncontrollable and prevents the performance of substantial gainful activity. (Tr. 21).

## V.    Discussion

In a  disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for

disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts

from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will

affirm the Commissioner's decision as long as there is substantial evidence in the record to

support his findings, regardless of whether substantial evidence exists to support a different

conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative

record and consider:

1. The credibility findings made by the ALJ.

2. The claimant's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The claimant's subjective complaints relating to
exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the
claimant's impairments.

6. The testimony of vocational experts when required which
is based upon a proper hypothetical question which sets forth the claimant's
impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The ALJ's decision whether a person is disabled under the standards set forth above is

conclusive upon this Court "if it is supported by substantial evidence on the record as a whole."

Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935

(8th Cir. 2008)). "Substantial evidence is less than a preponderance but is enough that a

reasonable mind would find it adequate to support the conclusion." Wiese, 552 F.3d at 730

(quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the

record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. Id. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001), or it might have "come to a different conclusion." Wiese, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." Wheeler v. Apfel, 224 F.3d 891, 894-95 (8th Cir. 2000). See also Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ failed to follow the instructions in the order from the Appeals Council remanding the case back to the ALJ. Next, Claimant contends that the ALJ failed to properly formulate his RFC inasmuch as the RFC is conclusory and fails to contain any reference to the supporting evidence.

A. Appeals Council Remand Order

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ failed to follow the instructions in the order from the Appeals Council remanding the case back to the ALJ.

The regulations state that "the administrative law judge shall take any action that is ordered by the Appeals Council and may take additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. § 404.977(b). In that order, the Appeals Council

ordered the ALJ to do the following: compare the demands of Claimant's past work with her RFC; evaluate the medical source opinions in the record concerning Claimant's GAF scores; consider the opinion of Dr. Krojanker; further consider the effects of Claimant's mental impairments on her RFC; evaluate the effects of her obesity; and obtain vocational expert testimony. (Tr. 82-84). Pursuant to the order of remand, the ALJ held a supplemental hearing on February 17, 2011. (Tr. 28-47). On April 1, 2011, the ALJ issued a decision denying Claimant's claims for benefits. (Tr. 7-21). Following the ALJ's decision, the Appeals Council again considered Claimant's case and ultimately denied further review and found no basis for changing the ALJ's decision. (Tr. 1-6). It is logically inferred, therefore, that the Appeals Council determined that the ALJ had indeed followed its directive. As such, no error is found.

The undersigned notes that Claimant's contentions regarding the ALJ's failure to comply with the Appeals Council's August 11, 2010 Order is not a basis to reverse the decision of the Commissioner. Some federal courts disagree as to whether an ALJ's failure to follow an Appeals Council's directives may serve as independent grounds for reversal absent other error. See Miller v. Barnhart, 175 F. App'x 952, 956 (10th Cir. 2006) (holding, that because "the Appeals Council found the [] ALJ complied with its remand order ... [I]t is appropriate to examine the Commissioner's final decision under our usual standards, rather than focusing on conformance with particular terms of the remand order"); Huddleston v. Astrue, 826 F.Supp.2d 942, 954-55 (S.D.W.Va. 2011) (citing conflicting case law, but ultimately holding that "an ALJ's failure to follow the directives of [a] remand order issued by the Appeals Council constitutes legal error" that may, but will not always, necessitate remand); Balde v. Astrue, 2011 WL 3419371, at *17 (E.D.Wis. Aug. 4, 2011)("whether the ALJ complied with the Appeals Council's remand order is

not, in the final analysis, of independent importance. The only question properly before [the court] is whether the ALJ's decision (which the Appeals Council chose to leave undisturbed) is supported by substantial evidence," *citing to* <u>Poyck v. Astrue</u>, 414 Fed.Appx. 859, 861 (7th Cir. 2011)).

Upon remand, an ALJ must take any specific action ordered by the Appeals Council "and may take any additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. § 404.977(b). A review of the record shows that the ALJ followed most of the Order, but he did not articulate Claimant's mental RFC in greater detail or obtain vocational expert testimony as directed. Nonetheless, the undersigned notes that the Appeals Council reviewed the ALJ's new decision, and on August 8, 2011, it denied Claimant's request for review and found no basis for changing the ALJ's decision. Cf. <u>Steahr v. Apfel</u>, 151 F.3d 1124, 1125-26 (8th Cir. 1998) (deferring to the district court's affirmance of the ALJ's decision on remand because the court "knew its original intent in remanding the case, and we will defer to the [court's] construction of its own order."). Consequently, in declining Claimant's request that it review the ALJ's decision, the Appeals Council examined the record and the ALJ's decision and concluded that the decision was supported by substantial evidence in the record. See, e.g. <u>Perez v. Chater</u>, 77 F.3d 41, 45 (2d Cir. 1996) ("even when the Appeals Council declines to review a decision of the ALJ, it reaches its decision only after examining the entire record."). The issue whether an ALJ complied with a remand order evaporates when the Appeals Council adopts the ALJ's decision as the Commissioner's final decision; with that action, the Appeals Council implicitly acknowledges that the ALJ's decision is compliant with the remand order. See <u>Walker v. Astrue</u>, 2009 WL 3160165, at *15 (E.D.La. Sept. 29, 2009); <u>see, e.g.</u><u>.Rogers v. Astrue</u>, 2008 WL

850131, at *15-16 (E.D. Cal. 2008) (holding that the ALJ's "failure to adhere strictly to" an Appeals Council's remand order was harmless error where substantial evidence supported the ALJ's decision on remand). Therefore, no reversible error occurred.

As discussed below, substantial evidence supports the ALJ's decision and thus any possible error with respect to the ALJ's failure to comply with the Appeals Councils instruction is harmless.

1.    Demands of Past Work

Claimant contends that the ALJ failed to set forth the demands of her past relevant work.

Based on Claimant's description of her past work as a food preparer set forth in the disability report completed by Claimant, the ALJ found that Claimant's past relevant job did not require the performance of work activities precluded by these limitations. In the Disability Report -Adult, Claimant described the job tasks she performed as well as the exertional and nonexertional demands of her job. The Eighth Circuit requires the ALJ to "make explicit findings on the demands of claimant's past work." Zeiler v. Barnhart, 384 F.3d 932, 936 (8th Cir. 2004) (citation omitted). As in the instant case, the ALJ may rely on the claimant's description of past work as he or she performed it to determine the demands of past relevant work. Id. Although the ALJ did not fully articulate the requirements of Claimant's past work in the opinion, he did incorporate her work history set forth in the disability report as constituting the demands of her jobs as food preparer for catering and found the demands were consistent with the ability to work. Such determination is sufficient to constitute substantial evidence that Claimant can return to her past relevant work as a food preparer for catering. See Clark v. Astrue, 2012 WL 625111, at *5 (W.D.Mo. Feb. 24, 2012) (finding that the ALJ did not err in finding that plaintiff could perform

his past relevant work as a custodian where the ALJ incorporated the demands of the past work in the opinion, found the demands consistent with medium work, found that the DOT listed the job of custodian as medium work, and determined Plaintiff could perform his past relevant work).

Further, the ALJ properly found that Claimant's alleged mental impairments were not severe and did not have more than a minimal effect on her ability to function in the workplace. The record demonstrates that Claimant could perform the demands of a food preparer. Therefore, substantial evidence supports the ALJ's determination that Claimant is capable of performing her past relevant work as a food preparer and is not disabled. Miles v. Barnhart, 374 F.3d 694, 700 (8th Cir. 2004) (upholding the ALJ's determination that Plaintiff could return to her past relevant work where she had worked and had not been terminated because of work-related mental impairments).

2.    Vocational Expert Testimony

Next, Claimant's contention that the ALJ's failure to elicit testimony from the vocational expert regarding other jobs in the economy she could perform requires remand is without merit.

At Step Four, the ALJ must consider whether the claimant retains the RFC to perform his past relevant work, either as the claimant actually performed the work or as the work is performed generally throughout the national economy. Wagner v. Astrue, 499 F.3d 842, 853 (8th Cir. 2007). If the claimant is able to perform either the specific work previously done or the same type of work as generally performed, the claimant is not disabled. Lowe v. Apfel, 226 F.3d 969, 973 (8th Cir. 2000). In determining whether the claimant can perform his past relevant work as he actually performed it, "[t]he ALJ must ... make explicit findings regarding the actual physical

and mental demands of the claimant's past work." <u>Pfitzner v. Apfel</u>, 169 F.3d 566, 569 (8th Cir. 1999). The ALJ found Claimant not disabled because she retained the RFC to perform her past relevant work as a food preparer. Accordingly, the ALJ found at step four that Claimant was not disabled within the meaning of the Act.

If the claimant can perform past relevant work, he is not disabled. <u>Morse v. Shalala</u>, 16 F.3d 865, 871 (8th Cir. 1994). An ALJ may rely on vocational expert testimony as substantial evidence to determine a claimant may return to past relevant work. <u>See</u> <u>Wildman v. Astrue</u>, 596 F.3d 959, 969-70 (8th Cir. 2010) (holding that vocational expert testimony and a proper RFC constituted substantial evidence for an ALJ to determine claimant could return to past relevant work). The record contains substantial evidence to support the ALJ's conclusion that Claimant could return to past relevant work and is therefore not disabled under the Act. Once a court has found that there is substantial evidence of the record as a whole to support the ALJ's decision concerning a claimant's disability, the five-step analysis need go no further. <u>Lewis v. Barnhart</u>, 353 F.3d 642, 648 (8th Cir. 2003). Because substantial evidence supported the ALJ's step four finding, the ALJ was not required to continue at step five and shift the burden to the Commissioner.

Instead of stopping his analysis after finding Claimant able to perform her past relevant work, the ALJ opined as follows:

> Even if one were to conclude that the food preparer job is somehow not relevant, or that its demands exceeded those of an unskilled job, the claimant would still not be disabled. She could still perform numerous unskilled jobs in the State of Missouri and throughout the national economy....

> Also, it is the undersigned's experience from his many years of presiding over Social Security disability adjudications that contract vocational experts

typically can and will cite numerous unskilled jobs locally, statewide, and nationwide such as hand packager, small parts assembler, housekeeper/cleaner, laundry worker, overnight office cleaner, overnight grocery store stocker, construction laborer and truck unloader, and isolated parking lot attendant. Most of these jobs do not require more than light or sedentary exertion (see footnote 2), and in addition to being unskilled they would require very little contact with co-workers, supervisors, or the general public if one wanted to find credible the claimant's allegation that she gets "paranoid" around other people.

(Tr. 19-20) (internal footnotes omitted).

The undersigned is puzzled by the ALJ's analysis in Step Five inasmuch as the ALJ found Claimant to be able to perform her past relevant work and thus was not required to proceed to Step Five. Only when a claimant has no past relevant work, or establishes inability to perform work because of medical impairments and limitations that are at least "severe," the burden is on the Social Security Administration to show that there are jobs existing in significant numbers in the national economy that the claimant can perform consistent with medically determined impairments, symptoms, functional limitations, age, education, work experience and skills, if any. 20 C.F.R. §§ 404.1512(g), 404.1560(c), 416.912(g), and 416.960(c). Because the ALJ did not err in finding Claimant could perform her past relevant work, the question whether there are other jobs in the national economy that can be performed by a person with Claimant's RFC need not be addressed. Mitchell v. Schweiker, 551 F.Supp. 1084, 1087 (W.D. Mo. 1982) ("It is not necessary to consider this step unless the ALJ determines that the claimant cannot return to her past employment); See Hepp v. Astrue, 511 F.3d 798, 896 (8th Cir. 2008) (inclusion of inconsistent paragraph in ALJ's decision was unfortunate but had no bearing on outcome and did not require reversal).

3.      GAF Scores

Claimant further contends that the ALJ failed to consider her lower GAF scores suggesting serious to major impairments in functioning. A review of the opinion shows that the ALJ considered Claimant's low GAF scores and noted the scores were not a particularly credible reflection of her level of functioning during the relevant period. (Tr. 17). The record shows that most of the lower GAF scores were taken from examinations completed while Claimant was incarcerated from 2005-2007.

Next the ALJ noted that the low GAF scores were inconsistent with Claimant's history of sporadic mental health treatment. (Tr. 17). The ALJ opined that "the low GAF scores of 40-43 were all measured at Hopewell, yet the claimant never had what can be called a sustained course of mental health clinic, at Hopewell or anywhere else, at least not outside the prison context she was in." (Tr. 17). The ALJ noted that"[h]er other appearances at Hopewell were from October to December 2007, once in March 2009, and once in November 2009 and January 2010." (Tr. 17). Claimant's sporadic mental health treatment is inconsistent with her alleged level of functional impairment. See Page v. Astrue, 484 F.3d 1040, 1044 (8th Cir. 2007) (affirming ALJ's determination that mental issues were not severe where claimant sought very limited treatment).

The ALJ noted that Claimant had no reason "for the lack of sustained, follow-up psychiatric treatment. There is no evidence that she has ever been refused outpatient or inpatient medical treatment, medication or mental health counseling because of inability to pay. A more likely explanation for such non-treatment is that the claimant never or rarely felt a genuine medical need for such attention or treatment." (Tr. 17-18).[4]

---

[4]The record is devoid of any evidence suggesting that Claimant sought any treatment offered to indigents. See Nelson v. Sullivan, 966 F.2d 363, 367 (8th Cir. 1992)(holding the mere use of nonprescription pain medication is inconsistent with complaints of disabling pain); Murphy v. Sullivan, 953 F.2d 383, 386-87 (8th Cir. 1992)(finding it is inconsistent with the degree of pain

The ALJ further noted that the lower GAF scores were inconsistent with other medical evidence in the record. The ALJ noted how the GAF scores assessed during one-time evaluations in December 1998 and January 2008 were 65 to 70 and 75 respectively. Based on the inconsistency between the low GAF scores and the other much higher GAF scores, the ALJ questioned whether the lower GAF scores were an accurate reflection of Claimant's true level of functioning. (Tr. 14, 17). See Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005) ("The ALJ found Dr. Okiishi's opinion that Goff suffered from extreme limitations was starkly inconsistent with Dr. Okiishi's opinion in February 2001 that Goff's Global Assessment Functioning (GAF) was 58. According to the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), a GAF of 51 to 60 indicates moderate symptoms. American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994). Thus, Goff's GAF is inconsistent with Dr. Okiishi's opinion that she suffers from extreme limitations."); Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 666-67 (8th Cir. 2003) (concluding the ALJ's decision that the GAF

---

and disability asserted where no evidence exists that claimant attempted to find any low cost medical treatment for alleged pain and disability). The record does not document that Claimant was ever refused treatment due to insufficient funds. See Osborne v. Barnhart, 316 F.3d 809, 812 (8th Cir. 2003) (recognizing that a lack of funds may justify a failure to receive medical care; however, a plaintiff's case is buttressed by evidence he related of an inability to afford prescriptions and denial of the medication); Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999); Murphy, 953 F.2d at 386 (If a claimant is unable to follow a prescribed regimen of medication and therapy to combat his difficulties because of financial hardship, that hardship may be taken into consideration when determining whether to award benefits). The fact that a claimant is under financial strain, however, is not determinative. Id. Here, as the ALJ points out, the record is devoid of any credible evidence showing that Claimant was denied treatment due to lack of finances and thus inferred that Claimant did not seek more frequent medical treatment more often, because she did not have a medical need for such treatment. Case law permits the ALJ's reasonable inferences. See Pearsall v. Massanari, 274 F.3d at 1218. Likewise, the record is devoid of any evidence showing that Claimant had been denied medical treatment or access to prescription pain medications on account of financial constraints. See Clark v. Shalala, 28 F.3d 828, 831 n.4 (8th Cir. 1994).

ratings did not appear to reflect the claimant's abilities was supported by the record).

4. Weight Given to Dr. Krojanker's Opinion

Claimant contends that the ALJ failed to properly accord controlling weight to Dr. Krojanker's opinions. The ALJ questioned whether Dr. Krojanker should even be classified as a treating physician inasmuch as Dr. Krojanker "had not treated claimant since January 27, 2010. His clinical note from that date did not show any remarkable acute mental disturbance, and Dr. Krojanker evidently believed the claimant to be stable enough that date that he did not even ask her to return until four months hence." In the Mental Residual Functional Capacity Questionnaire completed on December 6, 2010, Dr. Krojanker opined Claimant to be seriously limited in every aspect of functioning and to be suffering from schizophrenia, chronic type.[5] Dr. Krojanker checked boxes indicating Claimant to be seriously limited but not precluded in the mental abilities and aptitudes needed to perform unskilled work and particular types of jobs, but unable to meet the competitive standards of semiskilled and skilled work.

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. §404.1527(d)(2) (alteration in original). "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007) (internal quotations omitted). Thus, "'an ALJ may grant less

---

[5]The undersigned notes that Dr. Krojanker completed the questionnaire by checking boxes and citing no medical evidence. See Anderson v. Astrue, 696 F.3d 790, 794 (8th Cir. 2012) (conclusory checkbox form has little evidentiary value when it provides little or no elaboration and cites no medical evidence).

weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record.'" Id. (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir. 2000)).

A treating physician's opinion may be, but is not automatically, entitled to controlling weight. 20 C.F.R. § 404.1527(d)(2). Controlling weight may not be given unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. SSR 96-2P, 1996 WL 374188 (July 2, 1996). Even a well-supported medical opinion will not be given controlling weight if it is inconsistent with other substantial evidence in the record. Id. "The record must be evaluated as a whole to determine whether the treating physician's opinion should control." Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009). When a treating physician's opinions "are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight." Halverson v. Astrue, 600 F.3d 922, 930 (8th Cir. 2010( (quoting Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)). "A treating physician's opinion does not automatically control, since the record must be evaluated as a whole." Perkins v. Astrue, 2011 WL 3477199, *2 (8th Cir. 2011) (quoting Medhaug v. Astrue, 578 F.3d 805, 815 (8th Cir. 2009)). The ALJ is charged with the responsibility of resolving conflicts among the medical opinions. Finch v. Astrue, 547 F.3d 933, 936 (8th Cir. 2008).

Additionally, Social Security Ruling 96-2p states in its "Explanation of Terms" that it "is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record." 1996 WL 374188, at *2 (S.S.A. July 2, 1996). SSR 96-2 clarifies that 20 C.F.R. §§ 404.1527 and 416.927 require the

ALJ to provide "good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s)." Id. at *5.

In the December 6, 2010 Mental Residual Functional Capacity Questionnaire, Dr. Krojanker found Claimant seriously limited in every aspect of functioning, and she is unable to meet the competitive standards of semiskilled and skilled work. "A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination." House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007). Thus, the ALJ was not required to give any weight to this conclusory statement regarding Claimant's ability to work.

First, the undersigned notes that the medical source opinion cited by Claimant was completed almost eleven months after Dr. Krojanker last treated her. Likewise, the ALJ noted how during her last visit, Dr. Krojanker made no findings of any remarkable acute mental disturbance, but when completing the assessment, he found Claimant to be suffering from schizophrenia, chronic type.

The ALJ questioned whether Dr. Krojanker should be classified a treating source, and found that his assessment of December 6, 2010 was not entitled to controlling weight, because it was inconsistent with his prescribed medical treatment. See Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight."). Likewise, as noted by the ALJ, Dr. Krojanker's opinion is inconsistent with his own treatment notes. Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes."). An ALJ may

"discount or even disregard the opinion of a treating physician ... where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000); Hackler v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment). Indeed, in his treatment notes Dr. Krojanker never set forth any specific limitations or found Claimant to suffer from schizophrenia, chronic type or unable to work. Dr. Krojanker's treatment notes do not reflect the degree of limitation he noted in his December 6, 2010 assessment. The undersigned concludes that the ALJ did not err in affording little weight to Dr. Krojanker's opinion of December 6, 2010.

     5.    <u>Obesity</u>

     Claimant further argues that the ALJ failed to properly consider her obesity. The undesigned notes that the ALJ found Claimant's obesity to be a severe impairment. Although the decision does not specifically discuss Claimant's obesity and the effects it has on her RFC, the decision clearly supports the finding that Claimant did not have an impairment or combination of impairments that met or equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Throughout his discussion of the medical evidence, the ALJ consistently noted Claimant's obesity and how her weight fluctuated during the period relevant to her applications. In determining Claimant's RFC, the ALJ articulates that he considered all symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the objective medical evidence.

     None of the physicians who examined Claimant provided any limitations on her ability to perform work-related tasks because of her obesity. Moreover, Claimant neither alleged obesity in

her applications, nor discussed her obesity during the hearing. Neither the medical records nor Claimant's testimony demonstrates that Claimant's obesity results in work related limitations. McNamara v. Astrue, 590 F.3d 607, 611-12 (8th Cir. 2010). The ALJ considered all of Claimant's impairments in combination when determining that Claimant was not disabled. The undersigned finds that the ALJ considered Claimant's obesity in relation to her other impairments and her RFC.

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

B.    Residual Functional Capacity

 Next, Claimant contends that the ALJ failed to properly formulate his RFC inasmuch as the RFC is conclusory and fails to contain any reference to the supporting evidence. In formulating the RFC, the ALJ found Claimant capable of all work except she is unable to do more than simple, routine, repetitive, unskilled tasks.

A claimant's RFC is what he can do despite his limitations. Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001). The claimant has the burden to establish his RFC. Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). The ALJ determines a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. Goff v.

Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); Eichelberger, 390 F.3d at 591; 20 C.F.R. § 404.1545(a).  The ALJ is "required to consider at least some supporting evidence from a [medical professional]" and should therefore obtain medical evidence that addresses the claimant's ability to function in the workplace.  Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (internal quotation marks and citation omitted).  An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand.  Id.

In his decision the ALJ thoroughly discussed the paucity of the medical evidence of record, her daily activities, her felony conviction, and his observations of Claimant during the hearing.  See Gray v. Apfel, 192 F.3d 799, 803-04 (8th Cir. 1999) (ALJ properly discredited claimant's subjective complaints of pain based on discrepancy between complaints and medical evidence, inconsistent statements, lack of pain medications, and extensive daily activities).  The ALJ then addressed several inconsistencies in the record to support his conclusion that Claimant's complaints were not credible.

Specifically, the ALJ noted that no treating or consultative physician in any treatment notes stated that Claimant was disabled or unable to work or imposed significant long-term physical and/or mental limitations on Claimant's capacity for work.  See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987) (examining physician's failure to find disability a factor in discrediting subjective complaints).  The lack of objective medical basis to support Claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints.  See Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995)(lack of objective findings

to support pain is strong evidence of lack of a severe impairment); <u>Barrett v. Shalala</u>, 38 F.3d 1019, 1022 (8th Cir. 1994)(the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints).

In support of his credibility findings, the ALJ noted that no physician who examined Claimant found her to have limitations consistent with disability. <u>See</u> <u>Young v. Apfel</u>, 221 F.3d 1065, 1069 (8th Cir. 2000) ("We find it significant that no physician who examined [claimant] submitted a medical conclusion that she is disabled and unable to perform any type of work."). The lack of medical evidence supporting Claimant's complaints was a proper consideration when evaluating her credibility, <u>see</u> <u>Gonzales v. Barnhart</u>, 465 F.3d 890, 895 (8th Cir. 2006), as was her failure to pursue more aggressive treatment. <u>See</u> <u>Tate v. Apfel</u>, 167 F.3d 1191, 1197 (8th Cir. 1999). In addition, the ALJ noted that no physician had ever made any medically necessary restrictions, restrictions on her daily activities, or functional limitations. <u>Brown v. Chater</u>, 87 F.3d 963, 964-65 (8th Cir. 1996) (lack of significant medical restrictions imposed by treating physicians supported the ALJ's decision of no disability). Likewise, the ALJ noted how the medical record is devoid of any evidence showing that Claimant's condition has deteriorated or required aggressive medical treatment. <u>Chamberlain v. Shalala</u>, 47 F.3d 1489, 1495 (8th Cir. 1995) (failure to seek aggressive medical care is not suggestive of disabling pain); <u>Walker v. Shalala</u>, 993 F.2d 630, 631-32 (8th Cir. 1993)( lack of ongoing treatment is inconsistent with complaints of disabling condition). Next, the ALJ considered Claimant's felony conviction.

The ALJ noted that at the supplemental hearing he observed Claimant to have "no obvious signs of depression, anxiety, memory loss, or other mental disturbance." (Tr. 18).

While an ALJ cannot accept or reject subjective complaints solely on the basis of personal observations, an ALJ's observations of a claimant's appearance and demeanor during the hearing is a consideration. Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008) (holding that an ALJ "is in the best position" to assess credibility because he is able to observe a claimant during his testimony); Johnson v. Apfel, 240 F.3d 1145, 1147-48 (8th Cir. 2001) ("The ALJ's personal observations of the claimant's demeanor during the hearing [are] completely proper in making credibility determinations"); See Lamp v. Astrue, 531 F.3d 629, 632-33 (8th Cir. 2008) (holding that in assessing the plaintiff's allegations of lack of concentration, an impaired memory, and depression, the ALJ properly combined his review of the record with his personal observations); Flynn v. Astrue, 513 F.3d 788, 794 (8th Cir. 2008) (same with respect to the ALJ's observation, in assessing the plaintiff's physical RFC, that the plaintiff was able to sit through the one-hour hearing). These observations are supported by substantial evidence on the record as a whole.

After engaging in a proper credibility analysis, the ALJ incorporated into Claimant's RFC those impairments and restrictions found to be credible. See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir. 2003) (the ALJ "properly limited his RFC determination to only the impairments and limitations he found credible based on his evaluation of the entire record."). In relevant part, the ALJ restricted Claimant to unskilled work. The ALJ further found Claimant to be capable of performing her past relevant work as a food preparer.

As demonstrated above, a review of the ALJ's decision shows the ALJ not to have denied relief solely on the lack of objective medical evidence to support his finding that Claimant is not disabled. Instead, the ALJ considered all the evidence relating to Claimant's subjective complaints, including the various factors as required by Polaski, and determined Claimant's

allegations not to be credible. Although the ALJ did not explicitly discuss each Polaski factor in making his credibility determination, a reading of the decision in its entirety shows the ALJ to have acknowledged and considered the factors before discounting Claimant's subjective complaints. See Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996). Inasmuch as the ALJ expressly considered Claimant's credibility and noted numerous inconsistencies in the record as a whole, and the ALJ's determination is supported by substantial evidence, such determination should not be disturbed by this Court. Id.; Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996). Because the ALJ gave multiple valid reasons for finding Claimant's subjective complaints not entirely credible, the undersigned defers to the ALJ's credibility findings. See Guilliams v. Barnhart, 393 F.3d 798, 801(8th Cir. 2005).

The undersigned finds that the ALJ considered Claimant's subjective complaints on the basis of the entire record before him and set out the inconsistencies detracting from Claimant's credibility. The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ pointed out inconsistencies in the record that tended to militate against the Claimant's credibility. See Guilliams, 393 F.3d at 801 (deference to ALJ's credibility determination is warranted if it is supported by good reasons and substantial evidence). Those included the paucity of the medical evidence of record, her felony conviction, her daily activities, and the ALJ's observations of Claimant during the hearing. The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's determination. See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006); Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992).

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this 8th day of February, 2013.